1
2
3
4
5
6

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

8
9  UNITED STATES OF AMERICA,

10              Plaintiff,                    Case No. 3:21-CR-00024-RCJ-CLB

11  v.                                        **ORDER**

12  GREGORY W. PHEASANT,

13              Defendant.

14

15        The United States Attorney for the District of Nevada ("the Government") charged

16  Gregory Pheasant ("Pheasant") with three felonies stemming from his alleged failure to use a

17  taillight at night. Pheasant moved to dismiss the action, arguing that the indictment lacks

18  specificity and that the two regulatory charges are unconstitutional. Pheasant also brings a Motion

19  to Suppress, arguing that evidence was collected in violation of the Fourth Amendment. Beyond

20  those arguments, Pheasant contends that the charges should be dismissed, and the evidence should

21  be suppressed because the officers lacked stop and arrest power. For the reasons discussed below,

22  the Court grants the Motion to Dismiss and denies the Motion to Suppress as moot.

23  ///

24  ///

# I.    FACTUAL BACKGROUND

### (A)    Parties Involved

This case arises from Pheasant's interaction with an officer of the Bureau of Land Management ("BLM"). The BLM is an Interior Department agency established in 1946 through the consolidation of the General Land Office and the U.S. Grazing Service. BLM, BLM NATIONAL HISTORY, https://www.blm.gov/about/history/timeline (last accessed April 18, 2023). Nevada is a large state, but most of the land is managed by the BLM. (ECF No. 59 at 2 ¶ 8-9). More specifically, the BLM manages over 48 million acres of land in the state, which amounts to 63% of the state. *See* BLM, BLM NEVADA HISTORY, https://www.blm.gov/about/history/history-by-region/nevada (last accessed April 16, 2023).

The BLM, through the Secretary of the Interior, has the authority to promulgate regulations governing the land it manages. That authority includes the ability to issue any "regulations necessary to implement the provisions of [the Federal Land Policy and Management Act of 1976] with respect to management, use, and protection of the public lands." 43 U.S.C. § 1733(a). The regulations promulgated under that authority are subject to penalties that include prison terms of up to one year, thousand-dollar fines, or both. *Id*. Essentially, the BLM acts as a conservationist agency with law enforcement powers on public lands.

### (B)    The Incident[1]

On the night of May 28, 2021, The BLM was conducting a special operation to ensure a "family-oriented recreational experience" at Moon Rocks. (ECF No. 75 at 11). The special operation consisted of efforts from both federal law enforcement and BLM officers. (*Id*.)

---

[1] The facts come from the Incident Record that Officer Yost filed (ECF No. 59 at Ex. A), the Supplementary Incident Report that Officer Sarcinella filed (ECF No. 59 at Ex. B), and the body camera footage from the night of the incident (ECF No. 57 at Ex. D, E, F).

Pheasant and a number of other riders were riding their motorized dirt bikes through the Moon Rocks area without their taillights on. (ECF No. 63 at 2 ¶ 19). BLM Officer Michael Yost ("Officer Yost"), in his BLM Utility Vehicle ("UTV"), "attempted to make a traffic stop on [the riders] and one particular member was harassing [Officer] Yost … [by] yelling profanities and riding away before [Officer] Yost could make contact and identify the driver." (ECF No. 59 at Ex. B). Officer Yost followed the riders for a bit longer before losing "visibility due to dust from heavy use" of the road. (ECF No. 59 at Ex. A). The riders, including Pheasant, rode away on their dirt bikes because Officer Yost decided to stop following them due to the dust and darkness. (*Id.*).

Officer Yost again ran into the riders while he was patrolling the area, and this time he activated the UTV's lights and siren, but the riders did not yield. (ECF No. 59 at Ex. A). Officer Yost claims that the riders flipped him off and rocks from their tires hit him as they rode away. (*Id.*) After a brief period, Pheasant stopped on the main road in front of Officer Yost and yelled at the officer. (*Id.*) The body camera footage shows Officer Yost approaching Pheasant on foot and Pheasant yelling, "speak louder." (ECF No. 57 at Ex. D). Officer Yost responds to Pheasant by saying, "I got you on camera, so I will find you don't worry. You're on camera." (*Id.*) Officer Yost started to walk away and Pheasant drove away a few feet and yelled, "what the fuck did I do to you?" (*Id.*) Officer Yost turned around briefly and said, "you have no taillights."[2] (*Id.*) Pheasant then drove away and Officer Yost got back in his UTV. (*Id.*)

---

[2] Officer Yost states in his Incident Record that he "yelled that [Pheasant] needed to stop, and [he] tried to explain he needed to have rear taillights, but Pheasant drove off yelling 'fucking cop' 'fuck you.'" (ECF No. 59 at Ex. A). The audio on the body camera footage is not of the best quality. However, it is clear that Officer Yost did not ask Pheasant to stop his dirt bike after Pheasant asked him to speak up, which is when Officer Yost claims that he approached Pheasant. (ECF No. 57 at Ex. D). Further, it is unclear from the body camera footage whether Pheasant yelled "fucking cop" "fuck you." (*Id.*)

Officer Yost radioed BLM Officer Sarcinella ("Officer Sarcinella") and the other officers to inform them that the riders were heading in their direction. (ECF No. 59 at Ex. B.) At that moment, Officer Sarcinella "activated [his] emergency lights and pulled [his] UTV behind the group and attempted to make a traffic stop." (*Id*.) Officer Sarcinella approached the riders with his lights on but none yielded to the lights. (*Id*.) Officer Sarcinella pulled up behind Pheasant, which caused Pheasant to slow "down briefly as if yielding to [the] lights [before Pheasant] paused and then accelerated off-road for several hundred yards." (*Id*.) "Pheasant was not traveling at a high rate of speed," allowing him to gesture with his middle finger toward Officer Sarcinella. (*Id*.) While in front of Officer Sarcinella, the rocks from Pheasant's dirt bike allegedly shot out from under his tire, struck Officer Sarcinella's UTV with a few of the rocks coming through to hit his face. (*Id*.) Again, Pheasant rode away on his dirt bike and Officer Sarcinella chose not to pursue him. (*Id*.)

However, Officer Yost spotted Pheasant and one other rider on a hill nearby. (ECF No. 59 at Ex. A). Officer Yost approached the two of them without his lights on and the two riders allegedly shifted "their weigh in what appeared … to be preparation to drive away." (*Id*.) Officer Yost "quickly exited [the] UTV and stuck [his] baton through the spokes in the front tire of Pheasant's motorcycle so he could not again flee from the area." (*Id*.)

The body camera footage picks up the rest of this interaction, starting with Pheasant asking, "the fuck did I do to you dude?" (ECF No. 57 at Ex. E). Officer Yost responded with, "earlier you ran away from me." (*Id*.) Pheasant, visibly upset, yelled, "I haven't seen you all night. I just got here bro." (*Id*.) Officer Yost took step towards Pheasant and asked him to turn his lights on. (*Id*.) Pheasant yelled, "I don't have to do anything for you bro. Get a fucking warrant" (*Id*.) Officer Yost stated, "I don't need a warrant for traffic stops." (*Id*.) Pheasant disagreed and stated, "you do to fucking touch my bike. You want to see my taillight? Watch buddy." (*Id*.) Officer Yost then

asked for Pheasant's name and Pheasant responded by asking why he was being detained. (*Id.*) Officer Yost responded with, "you have no taillight" and Pheasant asked, "I am being detained for having no taillight? Write me a ticket." (*Id.*)

At this point, a large crowd of people on foot, in vehicles, and on dirt bikes assembled around Pheasant, Officer Yost, and the unidentified rider that was with Pheasant at the time he was stopped. (ECF No 57 at Ex. E). Officer Yost continued to ask Pheasant his first name. (*Id.*) After taking off his gear and trying to start his taillight, Pheasant responded and stated, "my name is Gregory W. Pheasant, officer." (*Id.*) Pheasant provided Officer Yost with what he claimed was his taillight. (*Id.*) Officer Yost stated that the taillight needed to be red and face the rear of his bike. (*Id.*) Officer Yost asked Pheasant for his date of birth and Pheasant complied. (*Id.*) Pheasant asked for a ticket for not having a taillight so that he could be on his way. (*Id.*) Officer Yost asked for the vehicle's registration and Pheasant explained that the dirt bike was recently purchased and the dealership had the registration information. (*Id.*) Pheasant made a few statements about making donations to the BLM before Officer Yost started to walk away and told Pheasant to wait there while he wrote the ticket. (*Id.*) While Officer Yost walked over to his UTV to identify Pheasant and call more units over to deal with the situation, Pheasant turned his bike and showed Officer Yost that his taillight worked. (*Id.*)

Before Officer Yost could write the ticket, additional officers showed up at the scene and asked Pheasant what the issue was. (ECF No. 57 at Ex. E). Pheasant explained that he was being written a citation for not having taillights. (*Id.*) Pheasant, again visibly upset, also asked the officer why he was being detained for having no taillight. (*Id.*) The unidentified officer told Pheasant to take a step back or he would walk away in handcuffs because "you don't approach a law enforcement officer." (*Id.*) Pheasant took a step back, muttered another expletive, and waited a few moments before stating "fuck you guys and fuck Phil…" (*Id.*)

While Officer Yost was away, Pheasant explained that he obeys the rules, is a professional rider, "is an upstanding citizen," "contributes to the offroad community in positive ways," and the officers are wasting their "fucking time." (EXF No. 57 at Ex. F). The unidentified officer stated that Pheasant "was also saying fuck you and fuck Phil and fuck whoever you were saying right…" (*Id*.) Pheasant responded, "I can say whatever I want." (*Id*.) The officer and Pheasant continued to talk over each other before Officer Yost walked back over to Pheasant to ask him for his address, phone number, and social security number. (*Id*.) Pheasant kept his abrasive demeanor while providing only his address and phone number but argued that he was not required to provide his social security number. (*Id*.) Officer Yost provided Pheasant with a copy of the citation, explained the rules for contesting the citation, and allowed Pheasant to leave. (*Id*.) Pheasant walked over to his vehicle, revved his engine, showed his taillight, put his fist in the air, and rode away yelling. (*Id*.)

## II.    ANALYSIS

The Government brings three counts against Pheasant: Count I Assault on a Federal Officer (18 U.S.C. § 111(a)(1) and (b)); Count II Resisting Issuance of Citation or Arrest (43 C.F.R. § 8365.1-4(a)(4)); Count III Failure to Use Required Taillight at Night (43 C.F.R. § 8341.1(f)(5) and (h)). Pheasant moves to dismiss all three counts. (ECF No. 59). Pheasant believes that all three counts fail to include the essential elements required to prove the count and fail to include the necessary factual specificity to the elements that the Government pleads. (ECF No. 59 at 18 ¶ 3-4). For that reason, Pheasant argues that all counts should be dismissed. (*Id*.) Pheasant also argues that Counts II and III are unconstitutional under the nondelegation doctrine. (ECF No. 59 at 5-13). Finally, Pheasant argues that the BLM officers did not have the authority to detain Pheasant, so Counts I and II are unconstitutional, given the lack of authority. (ECF No. 74).

The Court agrees with most of Pheasant's arguments. The officers did not have the authority to stop and detain Pheasant, so Counts I and II are defective. Without the authority to detain Pheasant, the BLM officers cannot be engaged in official duties. Further, Counts II and III are unconstitutional under the nondelegation doctrine because there is no intelligible principle to guide the Secretary of the Interior. Finally, the Government provided enough specificity for Count III, however, Counts I and II lack the specificity required. Accordingly, the Court will dismiss all three counts.

### (A)    Specificity

Indictments "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." FED. R. CRIM. P. 7(c)(1). Rule 12(b)(3)(B) provides defendants with five ways to challenge an allegedly defective indictment. *United States v. Qazi*, 975 F.3d 989, 993 (9th Cir. 2020). Relevant to this Order is the requirement that courts dismiss an indictment for "lack of specificity" and "failure to state an offense." FED. R. CRIM. P. 12(b)(3)(B)(iii) & (v).

Indictments are sufficient if they "contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against which he must defend" and "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 116 (1974). In ruling on a motion to dismiss an indictment for lack of specificity, the court is "bound by the four corners of the indictment" and must accept the facts alleged as true. *United States v. Lyle*, 742 F.3d 434, 436 (9th Cir. 2014) (quoting *United States v. Boren*, 278 F.3d 911, 914 (9th Cir.2002)).

Pheasant argues that the indictment fails to include "the type of assault alleged, the source of the alleged bodily injury, and identification of the injury itself." (ECF No. 59 at 19 ¶ 3-5). Count I alleges that on May 28, 2021, Pheasant "did forcibly assault, resist, oppose and interfere with [BLM] Ranger G.S.," while "Officer G.S. was engaged in and on account of the performance of

his official duties, inflicting bodily injury upon Ranger G.S." (ECF No. 1 at 1-2). The indictment does not provide any additional color to the events that occurred on the eve of May 28, 2021.

The Government failed to include any facts or circumstances to inform Pheasant of what he is being charged with under Count I and II. Rather, Count I merely states Pheasant's name, the date of the alleged crime, and a recitation of the statute he is being charged under. *See* 18 U.S.C. § 111(a)(1) ("forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any [official] while engaged in or on account of the performance of official duties"). Indictments can use the language of a statute to describe the charges, but the language must be supplemented with enough "facts and circumstances" to "inform the accused of the specific [offense]... with which he is charged." *Id.* at 117–18 (quoting *United States v. Hess*, 124 U.S. 483, 487 (1888)). Count I simply provides a recitation of the statutory language and nothing more.

Even worse, Count I cites section (b) of the statute but does not identify a weapon that Pheasant used or a bodily injury that the BLM officers suffered. *See* 18 U.S.C. § 111(b) (those in violation of section (a) and use a "weapon … or inflict[] bodily injury, shall be" in violation of this title). At a minimum, the Indictment must provide the essential elements of the crime charged. *Qazi*, 975 F.3d at 993–94. Otherwise, how would Pheasant know what exact conduct violated federal law? Count I undoubtedly cannot answer this question and Pheasant is not required to answer it himself. For that reason, the Court dismisses Count I for lack of specificity.

Count II suffers from the same deficiencies. Count II alleges that "[o]n or about May 28, 2021, … Gregory W. Pheasant … resisted issuance of a citation by authorized officers engaged in the performance of their official duties." (ECF No. 1 at 2 ¶ 5-8). Again, the Indictment fails to include any facts or circumstances and merely restates the regulatory language. *See* 43 C.F.R. § 8365.1-4(a)(4) (no person shall engage in activities including "[r]esisting arrest or issuance of citation by an authorized officer engaged in performance of official duties"). When exactly did

Pheasant resist the issuance of a citation? At the moment that he initially saw BLM officers but was not stopped? At the moment that Officer Yost put his baton in Pheasant's wheel? How did he resist issuance? The language of Count II does not meet the specificity required under Rule 12. Accordingly, the Court dismisses Count II.

However, Count III provides enough context given the crime that Pheasant allegedly committed. Count III alleges that Pheasant "operated an off-road vehicle on public lands during night hours … without required lighted taillights." (ECF No. 1 at 2 ¶ 13-15). This provides Pheasant with the actions that allegedly violated the law and when he engaged in the conduct at issue. While the language mirrors the language of the regulation at issue, enough facts and circumstances are available to apprise Pheasant of the charges against him. *See* 43 C.F.R. § 8341.1(f)(5) & (h) ("No person shall operate an off-road vehicle on public lands … [d]uring night hours, from a half-hour after sunset to a half-hour before sunrise, without lighted headlights and taillights").

**(B)**    **Nondelegation Doctrine**

Pheasant argues that Count II and Count III should be dismissed because the regulations creating the crimes were promulgated under an unconstitutional statute. Essentially, his argument is that 43 U.S.C. § 1733(a) delegates unfettered legislative authority to the Secretary of the Interior, a member of the Executive Branch, which violates the nondelegation doctrine. Therefore, accordioning to Pheasant, the regulatory charges of Count II and Count III are unconstitutional.

### *1. Legal Standard*

The Constitution establishes three separate branches of government: legislative, executive, and judicial. U.S. CONST. art. I, II, & III. The Framers of the Constitution separated these three branches of government out of fear that mixing the "legislative, executive, and judiciary" powers would "hav[e] a dangerous tendency" to lead to the "accumulation of power." *See* The Federalist

No. 47, at 301 (James Madison). Therefore, a breakdown in the separation of these powers is "the very definition of tyranny" because one branch could aggrandize power from another. *Id*. With these concerns in mind, the Framers created a government where three bodies would exist together, but separately. *Id*. Accordingly, the Framers prohibited branches from delegating their powers entirely to one another.[3] *See Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42-43 (1825) (finding that the Constitution prohibits Congress from delegating legislative powers to other branches).

The nondelegation doctrine exists to enforce the prohibition on the unconstitutional delegation of exclusive power from one branch to another. *Gundy v. United States*, 139 S. Ct. 2116 (2019) (plurality op.). The Constitution gives Congress "[a]ll legislative Powers," the President "[t]he executive Power," and the Courts "[t]he judicial Power." U.S. CONST. art. I, II, & III. However, it is well established that Congress can delegate some authority away to Executive agencies. *Mistretta v. United States*, 488 U.S. 361, 372 (1989). "[I]n our increasingly complex society, replete with ever changing and more technical problems . . . Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Id*. While Congress may not delegate to another branch "powers which are strictly and exclusively legislative," *Wayman*, 23 U.S. (10 Wheat.) at 42-43, Congress can give Executive agencies limited discretion to "implement and enforce the laws." *Gundy*, 139 S. Ct. at 2123 (plurality op.). The line between unconstitutional delegation and constitutional delegation sits between Congress properly "conferring authority or discretion as to [the law's] execution" or improperly delegating exclusively legislative power. *Field v. Clark*, 143 U.S. 649, 693-94 (1892) (quotation omitted).

---

[3] The Framer's idea of the separation of powers still exists today. As the Supreme Court recently pointed out, "[t]he federal government's powers, however, are not general but **limited and divided**." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin*., 142 S. Ct. 661, 667 (2022) (Gorsuch, J., concurring) (emphasis added) (citing *McCulloch v. Maryland*, 4 Wheat. 316, 405, 4 L.Ed. 579 (1819)).

The Supreme Court has wrestled with the dichotomy of delegation before. First, in *J.W. Hampton, Jr., & Co. v. United States*, the Supreme Court found that Congress does not violate the nondelegation doctrine if Congress "lay[s] down by legislative act and an **intelligible principle** to which the [Executive agency] is directed to conform." 276 U.S. 394 (1928) (emphasis added). From this decision, the intelligible principle test was borne. *Id.*; *see Mistretta*, 488 U.S. at 371-79 (1989) (holding that "[a]lthough Congress ha[d] delegated significant discretion," there was "no doubt" that the delegation was "sufficiently specific and detailed to meet constitutional requirements"); *United States v. Melgar-Diaz*, 2 F.4th 1263, 1266–67 (9th Cir. 2021), cert. denied, 142 S. Ct. 813 (2022) (relying on the intelligible principle test); *see also Jarkesy v. Sec. & Exch. Comm'n*, 34 F.4th 446, 459 (5th Cir. 2022) ("Congress gave the SEC a significant legislative power by failing to provide it with an intelligible principle to guide its use of the delegated power").

The modern-day nondelegation doctrine's intelligible principle requirements are straightforward. "[A] delegation is permissible if Congress has made clear to the delegee (1) the general policy he must pursue and (2) the boundaries of his authority." *Melgar-Diaz*, 2 F.4th at 1267 (quotation and citation omitted). Essentially, a statute is unconstitutional if Congress delegates legislative power to an Executive agency and does not provide an intelligible principle outlining the boundaries of the legislative power. *Id.*; See *Jarkesy*, 34 F.4th at 461.

### 2. *Nondelegation Applied*

#### (a) *Legislative Delegation*

The statute at issue here delegates legislative power to an Executive agency. Government action is legislative if it has "the purpose and effect of altering the legal rights, duties and relations of persons, including … Executive Branch officials . . . [who are] outside the legislative branch." *INS v. Chadha*, 462 U.S. 919, 952 (1983). The statute reads as follows:

> The Secretary shall issue regulations necessary to implement the provisions of this Act with respect to the management, use, and protection of the public lands, including the property located thereon. Any person who knowingly and willfully violates any such regulation which is lawfully issued pursuant to this Act shall be fined no more than $1,000 or imprisoned no more than twelve months, or both.

43 U.S.C. § 1733(a). The statute at issue allows the Secretary of the Interior to promulgate regulations on behalf of the BLM. These regulations "alter" the legal rights of those that use BLM land, which makes the statute quintessentially legislative. Therefore, the intelligible principle applies to the delegation of legislative power.

### (b) *Intelligible Principle*

The Government argues that the statute sets out an intelligible principle because the statute allows regulatory authority "with respect to the management, use, and protection of the public lands." *Id*. Further, the Government argues that the policy declarations accompanying the statute provide an intelligible principle. (ECF No. 63 at 5-6); 43 U.S.C. § 1701(a)(5), (8), & (12). Pheasant takes a textualist's view of the statute and argues that the language does not provide any intelligible principle. The Court agrees with Pheasant.

At a base level, Congress delegated the Secretary of the Interior broad legislative authority to determine when a rule is necessary for the management, use, and protection of public lands. 43 U.S.C. § 1733(a). The statute does not provide any guidance or restraint as to when the Secretary of the Interior shall promulgate rules. *Id*. Instead, the Secretary of the Interior can promulgate rules whenever it is "necessary." *Id*. There is no limiting language to provide the Secretary of the Interior with any considerations regarding when regulations are necessary. Instead, the words "management, use, and protection" serve as the limiting words. *Id*. But, the words "management, use, and protection" do not limit the authority to promulgate regulations because those words cover almost all conduct on public lands. That language has allowed the Secretary of the Interior to

promulgate a plethora of rules from housing policies[4], to traffic laws[5], to firearms regulations[6], to mining rules[7], to agriculture certifications[8]. (ECF No. 59 at 8 ¶ 8-14). That means that the Secretary of the Interior has unfettered legislative authority to promulgate rules for over 48 million acres of land, which is 68% of the state of Nevada.

Diving even deeper into the rules promulgated under the statute at issue, it is clear that the language provides the Secretary of the Interior with unfettered legislative authority. So broad that the Secretary of the Interior promulgated a rule allowing State BLM Directors to establish supplementary regulations "as he/she deems necessary." 43 C.F.R. § 8365.1-6. Not only can the Secretary of the Interior promulgate rules regarding the management, use, and protection of the public lands, but State BLM Directors that the BLM hires have the authority to issue regulations for the management, use, and protection of the public lands. Without any intelligible principle, the Secretary of the Interior has provided Executive employees with Congress' unfettered legislative power to govern individual states. In a state like Nevada, these State BLM Directors are essentially single-person legislators and governors because they promulgate regulations (laws) and enforce the regulations (laws). This delegation of power is the exact type of delegation that the nondelegation doctrine tries to prohibit because it tries to prevent "Congress from intentionally delegating its legislative powers to unelected officials." *NFIB*, 142 S. Ct. at 669. Nothing could be worse than delegating exclusive legislative authority to an appointed official and having that

---

[4] 43 C.F.R. § 8365.1-2(a) (how long individuals can camp at a particular spot).
[5] *Id*. § 8365.1-3(b)(1) (what kind of seatbelts individuals must wear); *id*. § 8341.1(g) (whether saddle horses have the right-of-way over off-road vehicles).
[6] 79 Fed. Reg. 9,267-01(4)(a) (Feb. 14, 2014); 65 Fed. Reg. 69781-03(4)(e) (Nov. 20, 2000) (prohibiting shooting firearms in particular areas near Winnemucca and Carson City).
[7] 73 Fed. Reg. 39,027-02(2) (July 8, 2008) (picking up rocks in certain parts of Humboldt, Pershing, and Washoe Counties).
[8] 65 Fed. Reg. 54544-01(a)(1) (Sept. 8, 2000) (prohibiting having hay, straw, or mulch that is not certified as weed-free on any BLM-managed lands in the state).

appointed official delegate the exclusive legislative authority to an employee of the appointed official.

Beyond the Secretary of the Interior's ability to legislate for whatever they see necessary is the power to write regulations criminalizing behavior. Allowing Executive agencies to create the very crimes they are tasked with enforcing effectively turns them into "the expositor, executor, and interpreter of criminal laws." *Aposhian v. Wilkinson*, 989 F.3d 890, 900 (10th Cir. 2021) (Tymkovich, J., dissenting) (emphasis omitted). Essentially, in the words of the Supreme Court, "the nation's chief prosecutor [gets] the power to write his own criminal code" on the public lands. *Gundy*, 139 S. Ct. at 2131 (2019) (Gorsuch, J., dissenting); *See United States v. Davis*, 139 S. Ct. 2319, 2325 (2019) ("[v]ague statutes threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide").

Here, the statute allows the Secretary of the Interior to promulgate rules with penalties that include either a fine of no more than $1,000 or twelve months in prison. 43 U.S.C. § 1733(a). The statute does nothing to cabin the Secretary of the Interior's ability to choose what is a crime. *Id*. With no limiting language, the statute gives the Secretary of the Interior the authority to promulgate its own criminal code on 68% of the land in Nevada, giving the BLM a larger jurisdictional area than the state police. Essentially, the BLM controls a majority of the land in Nevada and has the authority to write the laws on that area of public land, acting with as much authority as both the state legislature and the governor. In fact, the BLM has used this authority to write regulations criminalizing behavior that the state would normally criminalize, like outdated vehicle registration, coal exploration, horse adoption, noisiness, fraud, discrimination, and homelessness.[9] If the BLM

---

[9] 43 C.F.R. § 9268.3(a)(iv) (relying on § 1733(a)) (prohibition on operating an off-road

can promulgate all these regulations under 43 U.S.C. § 1733(a) then "the statute would seem to give the BLM 'virtually unfettered' discretion to write crimes on the land it manages." (ECF No. 69 at 8 ¶ 4-5) (quoting *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 542 (1935)).

There is no language in the statute that cabins the authority of the Secretary of the Interior to promulgate rules on behalf of the BLM. "If the intelligible principle standard means anything, it must mean that a total absence of guidance is impermissible under the Constitution." *Jarkesy*, 34 F.4th at 462. The Court understands the gravity of this Order, but it cannot "impos[e] limits on an agency's discretion that [is] not supported by the text" simply because it would make the ruling more palatable. *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 591 U. S. ___, ___ (2020) (slip op., at 16) (alteration and internal quotation marks omitted).

### 3. The Government's Arguments

The Government argues that the nondelegation doctrine case law forecloses Pheasant's argument and that other sections of 43 U.S.C. § 1733(a) provide an intelligible principle.

---

vehicle without proper "registration"). 43 C.F.R. § 9269.3–3(d)(2) (relying on § 1733(a)) (prohibition on "unauthorized exploration for coal"). 43 C.F.R. § 9264.7(a)(2) (relying on § 1733(a)) (prohibition on "[c]onvert[ing] a wild free-roaming horse . . . to private use"). 43 C.F.R. § 9268.3(a)(3)(ii) (relying on § 1733(a)) (prohibition on off-road vehicles "producing excessive noise"); 43 C.F.R. § 3809.401(b)(4) (relying on § 1733(a)) (prohibition on monitoring plans that do not account for "noise levels"). 43 C.F.R. § 9269.3–5(b)(iii) (relying on § 1733(a)) (prohibition on "permits secured by fraud"); 43 C.F.R. § 9265.5 (relying on § 1733(a)) (incorporating by reference prohibition on "taking any timber, trees, or other vegetative resources through falsifying, concealing, or covering up by any trick, scheme, or device a material fact, or making any false, fictitious, or fraudulent statements or representations, or making or using any false, fictitious or fraudulent statement or entry"); 43 C.F.R. § 3715.8-1 (relying on § 1733(a)) (prohibition on "falsify[ing], conceal[ing] or cover[ing] up by any trick, scheme or device a material fact, or mak[ing] any false, fictitious or fraudulent statements or representations, or mak[ing] or us[ing] any false writings or document knowing the same to contain any false, fictitious or fraudulent statement or entry"). 43 C.F.R. § 2805.12(a)(5) (relying on § 1733(a)) (prohibition on grantees and lessees "discriminat[ing] . . . because of race, creed, color, sex, sexual orientation, or national origin"). 43 C.F.R. § 8365.1-2(a) (relying on § 1733(a)) (prohibition on "[c]amping longer than the period of time permitted by the authorizing officer").

(a) *Case Law*

The Government relies on *United States v. Cassiagnol*, to argue that the Fourth Circuit already heard a challenge to a statute similar to the one at issue in this Action and rejected the nondelegation doctrine argument. 420 F.2d 868, 876 (4th Cir. 1970). In that matter, the Fourth Circuit analyzed a statute that delegated authority to the General Services Administration ("GSA") to criminalize certain conduct on properties it owned. 40 U.S.C. § 318. The GSA had the authority to "make regulations governing the operation, maintenance and use of government property." *Cassiagnol*, 420 F.2d at 876. The Fourth Circuit reasoned that the GSA was entrusted with a vast number of buildings, so the authority to promulgate rules "had to be **somewhat** general in nature." *Id*. (emphasis added). The Fourth Circuit's analysis of the GSA's authority has no relevance to this Matter because the two agencies and the statutes themselves are vastly different.

First, the statute at issue in *Cassiagnol* is not relevant here because the GSA's role is not as significant as the BLM's. The GSA's statute provided the agency with authority over government property, but, more specifically, government buildings. *Cassiagnol*, 420 F.2d at 876. The BLM's authority extends to all public lands. The two spaces could not be more different. Citizens have different rights when they enter government buildings as opposed to public lands. *Id*. For example, citizens do not have the same speech rights in federal courthouses as on public lands. *United States v. Vosburgh*, 59 F.3d 177 (9th Cir. 1995) (citizens "cannot claim a fundamental right of free speech because the courthouse is a nonpublic forum"). Citizens cannot possess firearms in federal buildings, while citizens can possess one on almost all public land. 41 C.F.R. 102-74.440 (prohibition on possession in federal facilities with some exceptions). Relevant to this case, citizens cannot drive off-road vehicles through government buildings, hunt in government buildings, and camp in government buildings. However, citizens can do all these things on public lands. The statute in

*Cassiagnol* granted the GSA the authority to regulate a space entirely irrelevant to the type of land that the BLM has the authority to regulate in this matter.

With those types of spaces in mind, it makes sense that the Fourth Circuit found the words "management, use, and maintenance" to be a limiting principle. Of course, those words, as applied in a government building, are enough to limit the GSA. The GSA couldn't, for example, use those words to criminalize the use of a motorized vehicle at night without a taillight, picking up types of rocks, and growing types of agriculture. Rather, the words in the statute granting the GSA authority and the space in which the GSA is authorized to regulate give the GSA a clear line as to what they can and cannot regulate.

Furthermore, even if the GSA and the BLM regulated the same type of space, one agency regulates a tenth of the land in the United States, making it vital that Congress provides an intelligible principle. The space that GSA has authority over is tiny compared to the land that the BLM has authority over. In total, "the GSA manages 371 million square feet of space, slightly less than 8,517 acres" of space within government buildings. (ECF No. 59 at 12 ¶ 3-4); GSA, GSA PROPERTIES, available at https://www.gsa.gov/real-estate/gsa-properties (last accessed April 21, 2023). "In Nevada alone, the BLM manages over five-and-a-half-thousand times that figure: 48 million acres—over 2 trillion square feet of space." (*Id*.); *See* BLM, BLM NEVADA HISTORY, https://www.blm.gov/about/history/history-byregion/nevada (last accessed April 21, 2023). The vast difference in the size of the land that each executive agency regulates makes an intelligible principle all the more critical.[10] Giving an Executive agency authority to regulate 10% of the

---

[10] The government argues that the grant of authority over a vast area of land means that a grant of broad authority is even more necessary. This could not be any further from the truth. Under that logic, Congress could create an agency governing all the land in the United States and grant the agency all Congress' legislative authority to allow agency to regulate all the land properly. But, as the Supreme Court has pointed out, Congress cannot "transfer" its legislative authority, nor

country and 30% of the country's mineral resources without "substantial guidance" runs afoul of

the constitution. *Whitman*, 531 U.S. at 475; CONG. RES. SERV., THE FEDERAL LAND MANAGEMENT

AGENCIES     1     (updated     February     16,     2021),     available     at

https://crsreports.congress.gov/product/pdf/IF/IF10585.

*(b) Statute's Subsections*

The Government argues that the policy declarations in the statute giving the Secretary of

the Interior authority limit the regulatory authority granted to the Secretary of the Interior. The

Government points to three policy declarations:

> [I]n administering public land statutes and exercising discretionary authority granted by them, the Secretary be required to establish comprehensive rules and regulations after considering the views of the general public; and to structure adjudication procedures to assure adequate third party participation, objective administrative review of initial decisions, and expeditious decisionmaking. 43 U.S.C. § 1701(a)(5).

> [T]he public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use. 43 U.S.C. § 1701(a)(8).

> [T]he public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands including implementation of the Mining and Minerals Policy Act of 1970 (84 Stat. 1876, 30 U.S.C. 21(a) as it pertains to the public lands. 43 U.S.C. § 1701(a)(12).

The Government argues that these provisions go beyond providing a guiding principle and provide

a "process by which the Secretary would issue regulations and what purposes such regulations

should serve." (ECF No. 63 at 7 ¶ 2-3). The Government is incorrect.

---

can it abdicate Article I power. *Schechter Poultry*, 295 U.S. at 529.

The policy declarations that the Government relies on provide the Secretary of the Interior with more authority, not a guiding principle to limit authority. The language in each policy declaration sets out goals for the Secretary of the Interior. These goals include "protect[ing]" "scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values," assisting with "the Nation's need for domestic sources of minerals, food, timber, and fiber," and "provid[ing]" for "human occupancy and use." 43 U.S.C. § 1701(a)(8), (12). The language here goes past simply issuing rules for the "management, use and protection" and expands it to a group of goals encompassing an impossibly wide set of subject matters. 43 U.S.C. § 1733(a). The Government also conveniently leaves out the other eleven policy declarations that further expand the Secretary of the Interior's authority. *See id.* (a)(1)-(7), (9)-(11), (13). While this language identifies specific policy goals, the policy goals themselves provide authority over almost every subject matter. For that reason, these policy goals do not provide an intelligible principle. Without an intelligible principle, the statute is unconstitutional and the regulations promulgated thereunder that Pheasant allegedly violated are dismissed.

### (C)    Stop-and-Arrest Authority

Pheasant also argues that the BLM officers lacked the authority to stop and arrest him, so Pheasant's detention was unlawful and the Counts relying on BLM officers "engaged in" official duties are defective. Pheasant is correct.

#### 1. Statutory Authority

Federal law provides the BLM, through the Secretary of the Interior, with enforcement authority. That authority includes the authority to issue regulations, bring actions in federal court, contract with local law enforcement to enforce laws issued under the statute, and the establishment of a uniformed desert ranger force in the California Desert Conservation Area. *See* 43 U.S.C. § 1733(a)-(g). Importantly, the statute does not provide the BLM with the authority to detain

individuals for alleged violations of federal law, nor does any other statute. The statute allows the Secretary of the Interior to promulgate regulations that provide BLM officers with the authority to "carry out … law enforcement responsibilities." 43 U.S.C. § 1733(c)(2). But, the Secretary of the Interior never promulgated a regulation providing BLM officers with that authority.[11]

The statute only allows the BLM to contract with "local officials" to enforce "Federal laws and regulations relating to the public lands or their resources." 43 U.S.C. § 1733(c)(1). According to the statute's language, these local officials have the right to carry out various law enforcement responsibilities across the public lands.[12] *Id*. The right to carry out law enforcement responsibilities includes the privilege to "carry firearms," "execute and serve any warrant," "make arrests," as well as "search" and "seize." *Id*. Accordingly, the statute's text is unambiguous on local officials' authority to stop-and-arrest people like Pheasant who allegedly violate federal law on public land.

Moreover, the statute's establishment and delegation of law enforcement authority to the uniformed desert ranger force for the California Desert Conservation Area indicates Congress' willingness to provide BLM officers with law enforcement authority. Under § 1733(e), "[t]he officers and members of [the uniformed desert] ranger force shall have the same responsibilities and authority as" the local officials that the BLM contracts with. The statute specifically recognizes this force but no others, even though the statute's enforcement authority extends to 244 million acres of public lands. (ECF No. 69 at 8 ¶ 9-10). Simply put, "[h]ad Congress wanted to do the

---

[11] Here, the BLM issued special operational guidelines that provided local law enforcement with the authority to stop-and-arrest people at the event that Pheasant was riding at. (ECF No. 74 at 4). The language of the operational guidelines clearly states that "[local law enforcement] must detail suspects prior to affecting a federal arrest. The U.S. Attorney's Officer will be contacted before making a federal arrest." (*Id*.) At bottom, this is an indication that the BLM officers in this case knew that they did not have stop-and-arrest authority.

[12] This of course excludes any regulations that the Secretary of the Interior may promulgate, but, as mentioned previously, the Secretary of the Interior has not issued any regulations providing the BLM officers with law enforcement authority.

same for BLM rangers everywhere, it could have done so." (ECF No. 74 at 5 ¶ 4); *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107 (2012) (articulating the interpretive canon that the text of a statute may express one thing and that inclusion "implies the exclusions of others"). Notably, the only officers with the authority to arrest are the uniformed desert ranger force and local law enforcement contracted for specific circumstances.

Congress has shown its willingness to provide executive bodies with officers that have law enforcement authority. These bodies include – but are not limited to – the GSA[13], Fish and Wildlife Service[14], National Park Service[15], Forest Service[16], Postal Service[17], Veterans Affairs[18], and Amtrak[19]. The statutes providing these federal bodies with officers all grant the officers the authority to make arrests, which is something that 43 U.S.C. § 1733 does not provide the BLM officers. While these statutes expressly provide these officers with arrest authority, there is one other statute that a few of these statutes use to define law enforcement: 28 U.S.C. § 2680. Under

---

[13] 40 U.S.C. § 1315(b) (the Secretary of Homeland Security may designate officers to "enforce federal laws," "make arrests," "serve warrants," and "conduct investigations").

[14] 16 U.S.C. § 7421(b)(3) (providing the Fish and Wildlife Service with officers that can "search, seize, arrest, and exercise any other law enforcement functions").

[15] 54 U.S.C. § 102701(a)(2)(B), (C), (D) (providing the National Park Service with officers that can "make arrests," "execute any warrant," and "conduct investigations").

[16] 16 U.S.C. § 559c(2)-(6) (providing the National Forest System with officers that can conduct investigations, "make arrests," "serve warrants," "search," and "seize").

[17] 18 U.S.C. § 3061(a)(1), (2), (5) (providing the United States Postal Service ("USPS") with officers that can "serve warrants," "make arrests," "make seizures"); *see* 39 C.F.R. § 233.1 (further specifying what the officers can do).

[18] 38 U.S.C. § 902(a)(1)-(2) (providing the Department of Veterans Affairs with officers that can "enforce Federal laws," "conduct investigations," "make arrests," and execute an "arrest warrant"); see 38 C.F.R. § 1.218 (setting out the guidelines for officers and the penalties for different infractions).

[19] 49 U.S.C. § 28101 (providing any United States railroad service with officers that can "enforce the laws of any jurisdiction in which the rail carrier owns property, to the extent of the authority of a police officer certified or commissioned under the laws of that jurisdiction").

that statute, an "investigative or law enforcement officer" is an officer "empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h). Again, Congress did not provide BLM officers with any authority to execute searches, seize evidence, or make arrests, so the BLM officers neither meet the statutory definition that other statutes refer to nor do the BLM officers have the same authority that other federal officers have.[20]

Finally, Nevada state law does not provide BLM officers with stop-and-arrest authority. Nevada Law provides DEA officers, FBI and Secret Services agents, BIA officers, and USPS Postal Inspectors with stop-and-arrest authority. *See generally* NEV. REV. STAT. §§ 171.124, 1245, 1255, 1257. At the risk of sounding like a broken record, if the Nevada Legislature wanted to provide BLM officers with stop-and-arrest authority, it would have.

### 2. No Authority to Stop Pheasant

It appears that the BLM officers here were not authorized law enforcement officers. Without the authority to stop-and-arrest people for allegedly violating federal law, Count I and Count II must be dismissed. The BLM officers did not have the authority to stop Pheasant, so they could not have been engaged in "official duties" when the BLM officers tried to stop-and-arrest him. *See* 18 U.S.C. § 111(a)(1) and (b); *see also* 43 C.F.R. § 8365.1-4(a)(4). Therefore, Pheasant could not have interfered with the BLM officers or resisted the issuance of a citation because the BLM officers were not engaged in official duties.

Further, Pheasant was illegally arrested because the officers did not have stop-and-arrest authority. "There has been an arrest if, under the circumstances, a reasonable person would

---

20 The Court recognizes that 43 U.S.C. § 1733 provides the BLM, through the Secretary of the Interior, with the authority to provide their officers with the authority to execute searches, seize evidence, or make arrests. But, as mentioned previously, that statute is an unconstitutional delegation of legislative authority.

conclude that he was not free to leave after brief questioning." *United States v. Del Vizo*, 918 F.2d 821, 824 (9th Cir.1990). Anything beyond "a brief stop, interrogation and, under proper circumstances, a brief check for weapons" is an arrest. *United States v. Robertson*, 833 F.2d 777, 780 (9th Cir.1987). In determining whether a stop amounts to an arrest, the Ninth Circuit also "consider[s] the specificity of the information that leads the officers to suspect that the individuals they intend to question are the actual suspects being sought and the number of police officers present." *United States v. Miles*, 247 F.3d 1009, 1013 (9th Cir. 2001) (citation and quotation omitted). "A warrantless arrest executed outside of the arresting officer's jurisdiction is analogous to a warrantless arrest without probable cause. . . [and] is presumptively unreasonable." *Ross v. Neff*, 905 F.2d 1349, 1353–54 (10th Cir. 1990). Unreasonable arrests are illegal arrests in violation of the Fourth Amendment. *United States v. Henderson*, 906 F.3d 1109, 1116–18 (9th Cir. 2019).

Officer Yost arrested Pheasant when he put his baton through the spokes of Pheasant's dirt bike. Pheasant was not free to move after a brief stop, interrogation, and brief questioning. Pheasant's dirt bike was unusable because Officer Yost had put his baton through the spoke of the vehicle. (ECF No. 59 at Ex. A). Further, a large group of BLM officers showed up to aid Officer Yost at the stop and made it clear to Pheasant that he was being stopped for his taillight. (*Id.*) Both of these factors point in the direction of an arrest. Without the authority to make an arrest, Officer Yost executed an unreasonable, illegal arrest in violation of the Fourth Amendment.

### (D)    Motion to Suppress

Pheasant's Motion to Suppress is denied as moot, given the dismissal of the charges brought against him.

///

///

///

### III.    CONCLUSION

IT IS HEREBY ORDERED that Pheasant's Motion to Dismiss is GRANTED. (ECF No. 59).

IT IS FURTHER ORDERED that Pheasant's Motion to Suppress is DENIED as moot. (ECF No. 57).

IT IS SO ORDERED.

Dated this 26th day of April 2023.

ROBERT C. JONES
United States District Judge